AO 91 (Rev. 11/11)   Criminal Complaint

# UNITED STATES DISTRICT COURT
for the

United States of America
v.
Luis Enrique Duran Montilla
Gerson Adony Chicas Alfaro
Keven Armando Marcano
Elloy M. Figueroa Pedraza

*Defendant(s)*

Case No. **4:24-mc-5660**

**4:24-mj-142**

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.
On or about the date(s) of __04/03/2024__ in the county of __Harris__ in the __Southern__ District of __Texas__, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 USC 1203<br>18 USC 371 | 18 USC 1203 Hostage Taking, namely that the defendants intentionally seized of detained another person, and threatened to kill, injure, or continue to detain that person; the defendants' purpose was to compel a third person to do an act or from doing an act as an explicit or implicit condition for the release of the person detained, and conspiracy to commit same in violation of 18 USC 371. |

This criminal complaint is based on these facts:
See attached affidavit.

☑ Continued on the attached sheet.

*Complainant's signature*

Special Agent Patrick Lewis
*Printed name and title*

Sworn to before me and signed in my presence

Date: 04/03/2024

*Judge's signature*

City and state: Houston, Texas

United States Magistrate Judge Dena Palermo
*Printed name and title*

## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

### AFFIDAVIT IN SUPPORT OF A CRIMINAL COMPLAINT

I, Patrick Lewis, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1. I am a Special Agent with the Federal Bureau of Investigation (FBI) and have been since 2019. I have conducted and assisted in investigations pertaining to domestic and international terrorism, public corruption, violent crime, organized crime, and gangs. I am currently assigned to the FBI Violent Criminal Squad whose focus is on complex criminal investigations targeting violent crime. Based on both my training and my participation in prior investigations into complex criminal organizations, I am familiar with the patterns of criminal activity and criminal enterprises that engage in crimes such as kidnapping for ransom, bribery, sex trafficking, fraud, and distribution of narcotics in furtherance of a criminal enterprise.

2. The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested arrest warrants and does not set forth all of my knowledge about this matter.

### STATUTORY AUTHORITY

3. Based on the facts set forth in this affidavit, there is probable cause to believe that the Defendants have violated Title 18, United States Code, Section 1203 (Hostage Taking) and Title 18, United States Code, Section 371 (Conspiracy) (the "TARGET OFFENSES").

### PROBABLE CAUSE

4. On March 27, 2024, the Harris County Sheriff's Office received a walk-in complaint from R.O. detailing the kidnapping of her boyfriend Williams MANRIQUEZ. The case was initially investigated by Harris County Sheriff's Office, which requested FBI assistance on or about March 28, 2024.

5. On March 28, 2024, the FBI interviewed R.O. R.O. provided the following information: on March 19, 2024, W. MANRIQUEZ, R.O.'s boyfriend, traveled to Michoacan, Mexico to visit his sick mother. W.M. contacted R.O. via WhatsApp and advised he had arrived in Michoacan, Mexico.

6. On March 23, 2024, W.M. was set to return to the United States. On March 25, 2024, at approximately 2:41 AM, R.O. received a WhatsApp message from W.M. saying that he had arrived in San Antonio, TX.

1

7. On March 25, 2024, at approximately 3:32 PM, R.O. received a phone call from M.H., W.M.'s sister. M.H. asked if R.O. had heard from W.M.; R.O. told her she had not. On March 25, 2024, at approximately 7:11 PM, R.O. received a call from unknown persons using phone number -6868. The unknown male caller advised R.O. that W.M. had been kidnapped and said if she notified law enforcement W.M. would be killed. The unknown male caller also said that if R.O. notified law enforcement, they would come for her and that they knew R.O.'s address. On March 25, 2024, at approximately 7:14 PM, R.O. received a photograph via text message from phone number -6868 depicting a person R.O. recognized to be W.M. lying face down with his hands bound behind his back with zip-ties and five guns pointed at his head.

8. On March 28, 2024, the FBI interviewed M.H. M.H. provided the following information: on March 19, 2024, W.M. traveled to Michoacan, Mexico to visit his sick mother. On March 23, 2024, W.M. was set to return to the United States.

9. M.H. did not know the method by which W.M. was traveling but advised he was entering the United States illegally. On March 25, 2024, M.H. received a call from persons unknown using phone number -6868. M.H. did not want to answer the call, so she had her husband, O.D., answer. The unknown male caller advised O.D. that M.H.'s brother W.M. had been kidnapped and demanded fifteen thousand dollars or W.M. would be killed. The unknown caller advised O.D. to send the ransom payment via Zelle.

10. On or about March 26, 2024, M.H. received a series of text messages. The text messages provided M.H. with Zelle account information which M.H. understood to be accounts to which to send the Zelle money transfers to pay the ransom.

11. On or about March 26, 2024, M.H. transferred two thousand dollars through her Bank of America account to one of the Zelle accounts. Family members of M.H. transferred two thousand dollars to another designated Zelle account that day as well.

12. On or about March 28, 2024, M.H. received multiple phone calls from phone number -6868. During these calls, O.D. spoke with an unknown person demanding money or W.M. would be harmed. During several of the phone calls, O.D. spoke with W.M., who asked O.D. to pay the money for his return.

13. As of April 2, 2024, M.H. and O.D. had made two additional Zelle payments bring the total ransom payments to the suspects to approximately six thousand thirty-five dollars.

14. On March 28, 2024, the FBI interviewed S.F., friend/roommate to R.O. and W.M. S.F. provided the following information: S.F. was contacted via telephone by an unknown person who claimed to be a family member of another kidnapping victim who was kidnapped along with W.M. The unknown person gave S.F. the phone number -9472 and advised they received a call from a person on this number who demanded ransom money for the return of their family member. S.F. called the -9472 Number and spoke with an unknown male who advised in sum and substance, he was a cop, and to just pay the money or your family member will be killed.

2

15.     S.F. recorded part of her conversation with the unknown male. In sum and substance, the male on the recording said "they're not going to kill him. They are beating him up but they're not going to kill him."

16.     Investigators were able to identify the address from which the -6868 number had been used as 4309 Harby Street, Houston, TX 77023-0000.

17.     On April 1, 2024, investigators contacted the record owner of 4309 Harby Street. The owner said that they rented the property through Booking.com and advised that it had been rented from March 31, 2024-April 4, 2024. The owner advised that the renter requested an early check-in on March 31, 2024, and requested to cancel the cleaning service scheduled for March 31, 2024.

18.     On April 1, 2024, owner that they had Nest cameras at the property. The owner provided a video clip to investigators via email from March 31, 2024 at approximately 11:35 AM, when the renters arrived. The video clip depicts thirteen individuals exit an SUV parked in the front driveway of 4309 Harby Street and enter the residence. One of the males wearing an orange shirt and darks pants exits the rear passenger compartment of the SUV and is motioned into the residence by another unknown male on camera. The male wearing an orange shirt and dark pants appears to be W.M. It appears from the video that W.M. was not free to leave the scene.

19.     The owner provided investigators access to the live Nest video feed and saved videos at 4309 Hardy Street. On March 31, 2024, at approximately 6:55 PM, an unknown male wearing a black T-shirt and blue jeans is captured on camera exiting a black sedan parked in the driveway of 4309 Hardy Street. As the unknown male approaches the front door of the residence, he reaches his right hand into the front of his waistband and pulls out a dark object consistent with that of a firearm, before walking off camera.

20.     On April 2, 2024, M.H. and O.D. communicated with one of the suspects. The suspect told M.H. and O.D. that if the hostage takers did not receive payment by 3:30 PM on April 2, W.M. would "have a bad day."

21.     On April 2, 2024, at 6:21 PM, a search warrant was obtained for the premises of 4309 Harby Street.

22.     On April 3, 2024, at approximately 1:31 AM, two males exited the front door of 4309 Harby St., Houston, TX 77023, and entered a black Mercedes sedan parked in the driveway of the residence. At approximately 1:33 AM, the black Mercedes exited the driveway and drove eastbound away from the residence. Active surveillance on the black Mercedes followed the vehicle to Chicas Cabaret, 9924 North Fwy, Houston, TX 77037. Surveillance observed the two males exit the vehicle and enter the listed establishment.

23.     On April 3, 2024, at approximately 2:18 AM, FBI Hostage Rescue Team (HRT) executed the search warrant at 4309 Harby Street. Keven ARMANDO MARCANO was called out of the residence and taken into custody in the front yard. HRT members entered the residence

3

and found Elloy M. FIGUEROA PEDRAZA in the back laundry room/bathroom area of the house and arrested.

24. W.M. was found in the hallway between the living room and bedroom. D.R.T., F.V.A. and S.P.H. were located in the back laundry room/bathroom area and recovered. Later interviews conducted by the FBI confirmed these three individuals were kidnapping victims.

25. During the initial entry of the search warrant a black with partial lower red grip firearm was located in the laundry room between the washer/dryer and the wall. This firearm appears to match one of the firearms pointed at W.M. head in the text message picture received by R.O.

26. On April 3, 2024, at approximately 3:00 AM, the two males observed occupying the black Mercedes exited Chicas Cabaret. The two males entered the black Mercedes and began traveling south on North Fwy. A marked Harris County Sheriff's Office vehicle conducted a vehicle stop on the vehicle on North Fwy. in front of 9839 North Fwy, Houston, TX 77037. Gerson ADONY CHICAS ALFARO (driver) and Luis ENRIQUE DURAN MONTILLA, front passenger, was taken into custody.

27. On April 3, 2024, the FBI interviewed W.M. (Victim 1). W.M. provided the following: W.M. went back to Mexico about a month ago to see his mom because she was sick. When it was time to return to the U.S., W.M. described his method of travel as "we contacted the man that was transporting us, I came on the bus and stayed in a house near the border," after which W.M. crossed over into the United States without inspection.

28. W.M. walked for two nights and spent a night in the brush. A car came to pick W.M. up at night. W.M. got into the car voluntarily, believing it to be a ride associated with his scheduled illegal entry into the United States. W.M. crossed the border with four other people, three of whom were the same individuals recovered during the April 3, 2024 FBI search warrant execution at 4309 Harby St., Houston TX, 77023.

29. W.M. and the others were under the impression they were going to their destination. After they were in the car driving for a while, the man riding in the front passenger seat pulled a gun on W.M. and the others. W.M. was shown a picture of the person known to be K. MARCANO and positively identified this as the front passenger of the vehicle. W.M. advised K. MARCANO was with him for the duration of the time he was held captive.

30. They took W.M. and the others to a house. They took W.M. and the others' clothes and took him up to the second floor and told him to shower.

31. After they showered, the kidnappers started calling the victims' family members. The kidnappers instructed W.M. and others to tell their family members that they arrived in the U.S. and that it was going to be a $15,000 ransom before they can be returned to their families. If the families did not pay the ransom, the kidnappers were going to kill W.M. and the other migrants. They specifically told W.M. they were going to cut his fingers or his ear off.

32. The kidnappers were using cellphones and appeared to be using multiple cellphones. The kidnappers had their phones on them the whole time. The kidnappers instructed W.M. to talk to his family via telephone and coached him on what to say.

33. W.M. advised the primary kidnapper conducting the calls to the family was a male who went by the name "Siete." "Siete" told W.M. not to look at his face or else he will beat W. MANRIQUEZ. W.M. was shown a picture of G. ALFARO and confirmed it was the person her knew as "Siete."

34. W.M. was then moved to another house and that is where the captors beat all the victims. W.M. described the beatings as slapping him, hitting him with shoes in the back of the neck. W.M. thought they were in the second location for approximately one day.

35. The kidnappers then moved the victims to a third location, and they were there for a couple days. The kidnappers tied W.M. up, slapped him around, and put multiple guns to his head. W.M. was shown the picture provided by R.O. of W.M. bound, and confirmed it was a picture of himself. W.M. was left bound for approximately three hours. After W.M. was untied, "Siete" walked in and said he is going to kill him. The victims stayed here for several days and then moved them to the last house, where they were recovered.

36. When they got to the final house (4309 Harby St., Houston, TX 77009), the kidnappers instructed W.M. to call his family again and tell them to pay up or else they will kill him. The kidnappers separated W.M. from everyone else because his family was not paying the ransom and because they believed his family was talking to law enforcement. The kidnappers said that that was why they were going to kill W. MANRIQUEZ. W.M. believed they would kill him if their demands were not met. K. MARCANO stayed in the same room as W.M. K. MARCANO pointed a gun at him. K. MARCANO always had a black gun on him.

37. W.M. believed if he fled the residence, he would be killed.

38. W.M. described being transported to the last location in a beige Chevrolet Tahoe. W.M. advised there was another victim who was transported to the final house in a black Mercedes by "Siete", aka G. ALFARO. That victim was able to escape on foot when arriving at the final house.

39. W.M. advised it was the same kidnappers the whole time. Sometimes they would have their friends come over.

40. W.M. positively identified a photograph of E. PEDRAZA (arrested at execution of the search warrant) as one of the kidnappers and provided the following: E. PEDRAZA was one of the kidnappers with him for most of the time he was held captive. E. PEDRAZA pointed guns at W.M. and slapped him. E. PEDRAZA was said to go by the name "Puerto Rico."

41. W.M. positively identified a photograph of L. MONTILLA (passenger of Mercedes) as one of the kidnappers and provided the following: L. MONTILLA went by the name

5

"Venezuela". L. MONTILLA pointed a gun at W.M. and called W.M.'s family and told them they would kill W.M. if the family did not pay up.

42. On April 3, 2024, D.T. (Victim 2) was interviewed by the FBI utilizing a Spanish-English Language Specialist. D.T. provided the following information: D.T. paid someone to transport him into the United States by illegal means. D.T. was supposed to pay nine thousand five hundred dollars when he arrived at a pre-planned house in the United States. D.T. provided a similar account to that of W.M. of being picked up near the border by vehicle with 4-5 other people. The driver and passenger got to San Antonio and stopped at a store to buy something. When they got out of the car, D. T.           realized the driver and passenger were armed with firearms. At this time, D.T. knew something was wrong. The driver and passenger did not speak to D.T. or the other occupants. The driver and passenger took D.T.'s and the other occupants' phones.

43. D.T. advised the threats began when the kidnappers began calling the victim's families. When the kidnappers called his dad and demanded ransom, D.T.'s dad gave the kidnappers number to an unknown person who called the kidnapper. D.T. was smacked across the face while on the phone with his dad for his dad giving out the number. D.T. felt like he would be killed many times.

44. D.T.'s father paid the full ransom amount of fifteen thousand dollars on Wednesday night. The kidnappers did not release D.T. after receiving the ransom.

45. D.T. positively identified a photograph of E. PEDRAZA as one of the kidnappers and provided the following: E. PEDRAZA pointed a firearm at him and threatened him. When the police came to the final house, E. PEDRAZA ran to the laundry room/bathroom, where D.T. and two other victims were located, and threw a firearm between the dryer and the wall.

46. D.T. positively identified a photograph of K. MARCANO as one of the kidnappers and provided the following: K. MARCANO was the person who took the victims' cell phones. K. MARCANO pointed a firearm at D.T. on many occasions.

47. D.T. positively identified a photograph of L. MONTILLA and provided the following: L. MONTILLA went by the name "Venezuela." L. MONTILLA was with the victims most of the time. L. MONTILLA pointed a firearm at D.T.

48. D.T. positively identified a photograph of G. ALFARO as one of the kidnappers and provided the following: G. ALFARO went by the name "Siete" or "7." G. ALFARO was the one in charge of the kidnappers. G. ALFARO was the one who made the phone calls to the families. D. T.           ) overheard G. ALFARO threaten other victim's families if the ransom was not paid. G. ALFARO was in charged of the money and always pointing firearms at the victims.

49. On April 3, 2024, F.A. (Victim 3) was interviewed by the FBI. F.A. gave a similar story as Victim 1 and Victim 2 regarding their entry into the United States. F.A. positively identified a photograph of E. PEDRAZA as one of the kidnappers and provided the following: E. PEDRAZA was one of the guys there all the time. E. PEDRAZA made phone calls demanding money from the victim's families. When the police came to the last house on April 3, 2024, E.

PEDRAZA came to the back laundry room area of the residence and threw a pistol there. E. PEDRAZA put a gun to F.A.'s head and threatened him if he did not pay.

50. F.A. positively identified a photograph of K. MARCANO as one of the kidnappers and provided the following: K. MARCANO was the person who took his phone from him. F.A. felt threatened when his phone was taken.

51. F.A. positively identified a photograph of L. MONTILLA as one of the kidnappers and provided the following: L. MONTILLA went by the name "Venezuela". L. MONTILLA pointed guns at F.A. L. MONTILLA forced F.A. to call his family and demand the ransom money.

52. F.A. positively identified a photograph of G. ALFARO as one of the kidnappers and provided the following: G. ALFARO was the boss of the kidnappers when the big boss "Cuba" was not around. G. ALFARO would collect all the money from the kidnappers. G. ALFARO always wore a mask.

53. On April 3, 2024, S.H. (Victim #4) was interviewed by the FBI. S.H. positively identified a photograph of E. PEDRAZA as one of the kidnappers and provided the following: when the police came to the last house location, E. PEDRAZA hid a gun in the laundry room.

54. S.H. positively identified a photograph of K. MARCANO as one of the kidnappers and provided the following: K. MARCANO picked him up originally with another passenger who looked exactly like him. K. MARCANO always had a gun on him.

55. S.H. positively identified a photograph of L. MONTILLA as one of the kidnappers.

56. S.H. positively identified a photograph of G. ALFARO as one of the kidnappers and provided the following: G. ALFARO was the second guy in charge. G. ALFARO threated S.H. with a gun. G. ALFARO made S.H. make ransom calls to his family.

57. Based on the foregoing your Affiant believes there is probable cause that on or about April 3, 2024, L. MONTILLA, G. ALFARO, K. MARCANO, and E. PEDRAZA committed Hostage Taking in violation of 18 U.S.C. § 1203(a)(2) and Conspiracy in violation of 18 U.S.C. § 371.

_____
Patrick Lewis
Special Agent, Federal Bureau of Investigation

Sworn to and subscribed before me by telephone on this the 3rd day of April, 2024 and I find probable cause.

*Dena Palermo*

Honorable Dena Palermo
United States Magistrate Judge

